UNITED STATES *v.* ENRIQUE C. LINEIRO (No. 4611)[1]

United States Court of Customs and Patent Appeals, June 28, 1949

*David N. Edelstein,* Assistant Attorney General (*Richard F. Weeks,* special attorney, of counsel), for the United States.

*Lawrence, Tuttle & Harper* (*Walter I. Carpeneti* and *George R. Tuttle* of counsel) for appellee.

[1] C. A. D. 410.

6

[Oral argument May 11, 1949, by Mr. Weeks and Mr. Tuttle]

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON,
Associate Judges

JACKSON, Judge, delivered the opinion of the court:

The United States has appealed from a judgment of the United States Customs Court, Third Division, entered in conformity with its decision, C. D. 1126, sustaining protests of appellee against the collector's assessment of duty on certain merchandise invoiced as milo maize at the rate of 2 cents per pound pursuant to the provisions of paragraph 763 of the Tariff Act of 1930, as "grass and forage crop seeds not specially provided for." It was claimed in the protests that the merchandise was entitled to free entry under paragraph 1722 of the said tariff act as a crude vegetable substance, or to be dutiable at 10 per centum ad valorem under paragraph 1558 as an unenumerated unmanufactured article. The pertinent provisions of the tariff act read as follows:

PAR. 763. Grass seeds and other forage crop seeds: * * * all other grass and forage crop seeds not specially provided for, 2 cents per pound: * * *

PAR. 764. Other garden and field seeds: * * * *Provided*, That the provisions for seeds in this schedule shall include such seeds whether used for planting or for other purposes.

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, * * *

PAR. 1722. * * * vegetable substances, crude or unmanufactured, not specially provided for.

The case was tried at Nogales, Arizona. Three witnesses appeared on behalf of appellee and the Government introduced into evidence two laboratory reports signed by the Chief Chemist of the U. S. Customs Laboratory, Los Angeles, California, on germination tests of two official samples of the imported merchandise. The Government also moved in evidence a part of a letter addressed to the Appraiser of Merchandise at Nogales, Arizona, signed by the Seed Technologist, Production and Marketing Administration, Federal-State Seed Laboratory, United States Department of Agriculture, Sacramento, California, in which the result of germination and purity tests on parts of the same samples was stated.

It appears that the merchandise is known as "Hegari," which is a grain sorghum.

One of the witnesses for appellee is the general superintendent of the Arizona Flour Mills at Tucson, Arizona. He supervised the unloading of the involved merchandise which was imported from Mexico. He handled hegari for many years and testified that it is one of the main grains dealt in by his establishment and that it is used constantly in the manufacture of the feeds produced in the Arizona Flour Mills. The witness personally took a composite

sample made by sampling each of 50 or 60 sacks of the imported goods that came in one of the cars and gave the sample to the manager of the said flour mills. He said that the sample weighed between five or six pounds and that it appeared to be a very poor grade of grain in that it was dirty, containing much dobe dirt and trash, together with cracked grains. The witness further stated that the grain appeared to be shrivelled, as though it were frostbitten or had not had a sufficient supply of water. With respect to the second car in which part of the involved merchandise was shipped, he stated that he had observed the grain when it arrived at the plant of his company. He saw it being unloaded, cleaned, ground, and mixed with other feeds produced by the milling company. He stated that the physical condition of the grain in the second car was about the same as that in the first car. All of the involved merchandise was ground and mixed with cattle feed and chicken feed for sale.

While the witness was on the stand, two cartons, containing the said official samples taken from one sack of each car, were moved in evidence by counsel for appellee without objection. He testified to the obvious fact that the taking of the official samples, one from one sack in each car, was not a fair sampling of the shipments, since one of the cars contained 803 sacks of grain and the other 769. The witness stated that both of the said samples were a better class of hegari than the rest of the shipment in that they contained less cracked grain and dobe dirt.

The Manager of the Arizona Flour Mills at Tucson testified that hegari is a common feed stuff used in Arizona, and that he had bought the imported merchandise in Hermosillo, Mexico. While he knew the kind of hegari grown in the Hermosillo region, he testified that he had not examined the importation at that place. He examined all of the imported goods at Tucson. He described it as being very inferior, because he said it contained a great amount of cracked, shrivelled, and immature grain, together with considerable dust and dirt. The involved merchandise was ground and mixed in feed for cattle and poultry, because the witness stated it was inferior to the quality of hegari his company sold as whole grains. He corroborated the former witness as to the taking of the sample, a part of which was sent to the University of Arizona to be examined by the Professor of Agronomy at the College of Agriculture of that institution. That sample, as heretofore noted, had been taken from one car, and while samples were also taken from the second car, none of the samples were preserved, and therefore were not before the trial court. The witness agreed that the characteristics of the merchandise were the same as those stated by the former witness.

The Professor of Agronomy at the University of Arizona has charge of all the research programs in field crops of that state. He was

eminently qualified to testify concerning the imported grain. He stated that the sample of hegari which he received was dirty, filled with dust, trash, and cracked grains, and also that very many of the seeds were discolored, shrivelled, and immature. After examining the official samples, he stated in effect that those samples were much better than that which had been sent to him. He did state, however, that the external appearance of the official samples was similar to that which had been sent to him in that the seeds were discolored, and that there was much trash and seed coats therein, but that the official samples contained much less cracked grain and not so many seeds of small size and shrivelled condition. The witness made no test for germination of the sample submitted to him, although he had made such tests many times with reference to hegari. All that the witness did, with respect to the sample which had been sent to him, was to make a visual observation of it. However, he testified that he could give an opinion as to the germinating quality of that sample, although the reason it had been sent to him was merely for the purpose of identifying it as hegari. In answer to a point blank question, the witness stated that he would not hazard a guess as to whether the sample met the 75 per centum standard of pure, live seed as required by the Federal Seed Act, 7 U. S. C., sec. 1581. He was of opinion that the grain he looked at was well below the standard set by the State of Arizona, which requires a germination quality of at least 85 percent. He said that to determine the germination of hegari seed, a test lasting over a period of ten days would be required. As before mentioned, the testimony of the witness with respect to the character of the grain in the sample before him was based entirely upon observation.

In the laboratory report in evidence it was stated that the test for germination, made by the Chief Chemist of the United States Customs Laboratory, on one of the samples showed a viability of 84%, and with respect to the second sample, there was a viability of 82%.

The report on the germination and purity tests by the Federal technologist disclosed that of one sample, 77% of the seed germinated and contained 76.42% of pure, live seed, while the other sample had a germination of 78% with 76.72% of pure, live seed.

The trial court held that the use of the grain, whether or not for seeding purposes, was immaterial, pointing out that the proviso in paragraph 764 applies to paragraph 763, citing *United States* v. *Albers Bros. Milling Co. and Geo. S. Bush & Co.*, 19 C. C. P. A. (Customs) 88, T. D. 45226.

The trial court noted that the Federal Seed Act prohibits the importation of any seed unfit for seeding purposes. It quoted sec. 1584 (c) reading as follows:

(c) If any such seed contains less than 75 per centum of pure, live seed, or if any component of such seed present to the extent of 10 per centum or more con-

tains less than 75 per centum of live seed: *Provided,* That when the Secretary of Agriculture shall find that any such seed or any kind of seed present to the extent of 10 per centum or more cannot be produced to contain 75 per centum of pure, live seed, he may set up such standard from time to time for pure, live seed as he finds can be produced.

together with sec. 1582 (*c*) (2)

(2) When the Secretary of Agriculture finds that a substantial proportion of the importations of any kind of seed is used for other than seeding purposes, and he provides by rules and regulations that seed of such kind not imported for seeding purposes shall be exempted from the provisions of the chapter: *Provided,* That importations of such kind of seed shall be accompanied by a declaration setting forth the use for which imported when and as required under joint rules and regulations prescribed under section 1592 of this title.

The court observed that both regulations were issued by the Secretary of the Treasury and the Secretary of Agriculture for the enforcement of the Federal Seed Act, Code of Federal Regulations, Cum. Supp., title 7, sec. 201.201–201.231. Under those regulations, entries involving the importation of certain seeds, including sorghum, "shall contain a statement by the importer setting forth the use for which imported. When imported for seeding purposes such seed is subject to the import provisions of the Act." The entries in the instant case contain no staetment as to the use for which the grain was imported, although affidavits were filed, bearing dates several days subsequent to the dates of entry. It was stated in the affidavits that the imported grain "* * * was upon arrival at the plant of the Arizona Flour Mills at Tucson, ground, mixed with other feed ingredients and sold for poultry or dairy feed." It is clear that the regulation, with respect to the statement by the importer was not observed.

The trial court was of opinion that compliance or noncompliance with the regulation was not determinative of the question involved, stating that in its opinion if the imported merchandise contained 75 per centum or more of pure, live seed, as provided in the Federal Seed Act, it was dutiable as seed, because it would then be fit for use as seed.

It was said, in the opinion of the trial court, that the sample of grain taken by appellee was more representative than those taken by the Government. While that appears to be true, the sampling by appellee did not meet the requirements of the regulations.

The court, after noting that the results of the official tests were said by witnesses for appellee to indicate that the live, pure seed content of the official samples was not much more than the critical 75 per centum, stated as follows:

It seems logical to suppose, therefore, that the bulk of the merchandise, which contained more shrivelled and cracked grain and appeared frostbitten, would have shown less than the required 75 per centum of pure, live seed. The exceptions provided in the Federal Seed Act and the regulations issued thereunder

indicate that it was well-known that certain seeds, including sorghum, were imported for other than seeding purposes and were therefore not required to meet the standards set up by the act. While this would not preclude merchandise which met the germinability test from being dutiable as "seed" under the tariff act, it is an indication that such merchandise is rarely imported. Taking all of the circumstances of this case into account, we find that the merchandise herein was not "seed" within the meaning of paragraph 763 of the Tariff Act of 1930.

The court overruled the protests in so far as free entry was claimed under paragraph 1722, and no cross appeal was taken from that holding. Therefore, the only issue to be considered here is whether or not the imported goods are dutiable as classified by the collector, and if not so dutiable, whether or not it was properly held by the court below to be classifiable within the category of nonenumerated unmanufactured articles.

It is trite to say that in customs litigation, the importer has the burden of proving not only that the classification made by the collector is wrong, but he must further show affirmatively the correctness of his own contention. *United States* v. *Gardel Industries*, 33 C. C. P. A. (Customs) 118, C. A. D. 325; *Joseph E. Seagram & Sons, Inc.* v. *United States*, 30 C. C. P. A. (Customs) 150, C. A. D. 227, and cases cited therein.

From the record, as hereinbefore set out, it could well be held that the presumption of correctness attaching to the collector's classification was destroyed. However, there is nothing in the record establishing or tending to establish that the involved merchandise contained less than 75 per centum of pure, live seed.

Determination of issues in customs litigation may not be based on supposition. We do not see how it can be reasoned that because the involved merchandise contained more shrivelled, cracked, and frost-bitten grain, that in the absence of proof it can be held to contain less than 75 per centum of pure, live seed. At most such supposition is merely a speculation or guess.

For the reason that in our opinion appellee did not sustain his burden of proof, the judgment of the United States Customs Court is *reversed*.

By reason of illness, HATFIELD, Judge, was not present at the argument of this case and did not participate in the decision.